UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

-against-

SONJA ANTICEVIC; DAVID PAJCIN; EUGENE
PLOTKIN; STANISLAV SHPIGELMAN;
NIKOLAUS SHUSTER; JUAN C. RENTERIA, JR.;
HENRY SIEGEL; ELVIS SANTANA; MONIKA
VUJOVIC; MIKHAIL PLOTKIN; PERICA
LOPANDIC; BRUNO VERINAC; ZORAN
SORMAZ; ILIJA BORAC; ANTUN DILBER;
ANTO KRSIC; and JASON C. SMITH,

Defendants.
-----------------------------------------------------------------x

WOOD, U.S.D.J.:

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/2/10

05 CV 6991 (KMW)
OPINION & ORDER

Plaintiff the Securities and Exchange Commission ("SEC") moves for a default judgment

and summary judgment against Defendant David Pajcin ("Pajcin"), pursuant to Rules 55(b) and

56(c) of the Federal Rules of Civil Procedure ("FRCP"). The SEC also moves for a permanent

injunction against Pajcin, and an award of (1) $7,719,494.89 in disgorgement and prejudgment

interest, and (2) $20,046,334.17 in civil penalties.

For the reasons stated below, the Court GRANTS the SEC's motion.

I.    Factual Background

The following facts are set forth in the SEC's Local Rule 56.1 Statement, and are

undisputed by Pajcin:

In 2004 and 2005, Pajcin and an associate, Defendant Eugene Plotkin ("Plotkin"),

orchestrated three insider-trading schemes (the "Schemes"). The first Scheme involved

confidential, non-public information obtained from an employee of Merrill Lynch & Co., Inc.

("Merrill Lynch") (the "Merrill Lynch Scheme"). In 2004, Plotkin introduced Pajcin to

1

Defendant Stanislav Shpigelman ("Shpigelman"), who was then employed as a Mergers and Acquisition Analyst at Merrill Lynch. Pajcin, Plotkin, and Shpiegelman agreed that Shpiegelman would provide Pajcin and Plotkin with confidential non-public information regarding pending mergers and acquisition transactions being handled by Merrill Lynch.[1] Pajcin and Plotkin promised Shpiegelman a percentage of the profits they made from trading on the information.

Pajcin personally traded on the basis of the information received from Shpiegelman. At first, he traded through an account held in his own name at OptionsXpress Holdings, Inc. (the "Pajcin Account"). Beginning in June 2005, in order to avoid detection, Pajcin ceased trading in the Pajcin Account, and began trading through accounts held in the names of Defendants Sonja Anticevic ("Anticevic") and Monika Vujovic ("Vujovic). Pajcin had helped Anticevic and Vujovic open their accounts, and he promised them a portion of the profits he earned through his trading in their accounts.[2] Pajcin also provided Defendants Elvis Santana, Henry Siegel, Perica Lopandic, Bruno Verinac, and Mikhail Plotkin with the information obtained from Shpiegelman, in exchange for a percentage of their profits from trading on the information. With Pajcin's knowledge, Lopandic and Verinac tipped Defendants Zoran Sormaz, Ilija Borac, Antun Dilber, and Anto Krsic about the information, and they also placed illegal trades and paid a portion of their profits to Pajcin. Pajcin and the other Defendants who traded on the information obtained

---

[1]     As a Merrill Lynch employee, Shpigelman owed Merrill Lynch duties of trust and confidence that he breached by providing Pajcin and Plotkin with the confidential, non-public information.

[2]     The SEC has brought securities fraud claims against co-defendants Anticevic and Vujovic in connection with their participation in the Schemes. Vujovic has disgorged the profits earned through trading in her account, without admitting or denying the allegations in the complaint. The Court entered a final judgment against Vujovic in January 2009. Anticevic is contesting the SEC's claims. She asserts that she did not know that Pajcin was conducting illegal trades through her accounts. The Court has not ruled on the claims against Anticevic.

through the Merrill Lynch Scheme earned a total of approximately $6,615,038.63 in profits on their trading.

Pajcin's and Plotkin's second Scheme involved confidential, non-public information obtained from Business Week magazine (the "Business Week Scheme"). In the summer of 2004, Pajcin and Plotkin placed online job listings, in order to find someone who would be willing to steal copies of Business Week magazine prior to publication, and provide Pajcin and Plotkin with confidential, non-public information from Business Week's "Inside Wall Street" column. The "Inside Wall Street" column often contained information that could affect the stock prices of publicly traded companies. Defendant Nikolaus Shuster ("Shuster") responded to Pajcin's and Plotkin's job listing, and agreed to participate in the Scheme. In October 2004, Shuster obtained a job at Quad/Graphics, Inc. ("Quad"), a printing plant that prints Business Week. Each week, Shuster stole a copy of the upcoming issue of Business Week, before it was released publicly, and informed Plotkin and Pajcin about the contents of the "Inside Wall Street" column.[3] Plotkin and Pajcin paid Shuster a set fee for each copy of the magazine that he stole.

As with the Merrill Lynch Scheme, Pajcin tipped Santana, Siegel, Lopandic, Verinac, and Mihail Plotkin about the information obtained through the Business Week Scheme, and Lopandic and Verinac tipped Sormaz, Borac, Dilber, and Krsic. All of these Defendants paid Pajcin a percentage of the profits they earned by trading on the information. Pajcin personally traded on the information through Anticevic's and Vujovic's accounts. Pajcin and the Defendants who traded on the Business Week information earned a total of approximately $282,573.32 in profits.

---

[3]     As an employee of Quad/Graphics, Inc., Shuster owed duties of trust and confidence to Quad/Grapics and the owners of Business Week, which he breached by stealing copies of the magazine and providing Pajcin and Plotkin with confidential, non-public information contained in the "Inside Wall Street" column.

3

The third and final Scheme involved confidential, non-public information obtained by Defendant Jason Smith ("Smith"), while he was sitting on a federal grand jury investigating potential fraudulent accounting at Bristol-Myers Squibb ("Bristol-Myers").  Smith agreed to provide Pajcin with confidential, non-public information about the case against Bristol-Myers, in exchange for a percentage of the profits Pajcin earned from trading on that information.  Pajcin traded on the basis of the information provided by Smith through the Pajcin Account and the accounts held by Anticevic.[4]  Pajcin and Plotkin tipped Mikhail Plotkin and Siegel about the information provided by Smith, and these Defendants also traded on the information.  The information Smith provided was inaccurate, however, and the Defendants did not profit from their trades.

In total, therefore, Pajcin and the other Defendants who traded on the basis of the confidential, non-public information provided through the Schemes earned a total of approximately $6,897,611.95 in profits.

II.     Procedural History

The SEC commenced this action against Pajcin and the other Defendants in August 2005. The SEC alleges that Pajcin knowingly obtained confidential, non-public information through the Schemes, and personally traded and assisted others in trading on that information, in violation of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), and Sections 10(b) and 14(e) of the Securities Exchange Act of 1932 (the "Exchange Act") and Rules 10b-5 and 14e-3 thereunder.  Pajcin submitted an answer to the First Amended Complaint filed by the SEC, but has not responded to the Second, Third, or Fourth Amended Complaints.

---

[4]     As a grand juror, Smith was subject to the grand jury secrecy obligations of Rule 6 of the Federal Rules of Criminal Procedure, which he violated by providing Pajcin with information from the proceedings.

In 2006, the Government began a criminal investigation into the Schemes. In April 2006, Pajcin was charged in a seven-count Superseding Information with conspiracy to commit securities fraud and securities fraud.[5] The charges in the Superseding Information arise from the same conduct at issue in this case. Pajcin pled guilty to the Superseding Information on April 13, 2006. In January 2008, Pajcin was sentenced to time served and three years' supervised release. A few months later, Pajcin violated the terms of his probation and disappeared. His current whereabouts are unknown, and a warrant for his arrest has been issued.

Following Pajcin's disappearance, on July 31, 2009, the SEC filed the instant motion for a default judgment and for summary judgment, along with a Local Rule 56.1 Statement. The Court ordered Pajcin to respond to the motion by no later than August 28, 2009. To date, Pajcin has not responded.

III.     Analysis

        A.  Default Judgment

A default judgment is ordinarily justified where a defendant fails to respond to the complaint. Bermudez v. Reid, 733 F.2d 18, 21 (2d Cir. 1984); see also Eastern Freight Ways, Inc. v. Eastern Motor Freight, Inc., No. 02 Civ. 3138, 2003 WL 21355486 (S.D.N.Y. Jun. 11, 2006) (granting default where plaintiff did not respond to complaint or to court order for plaintiff to have a new attorney file a notice of appearance on his behalf). Default is proper where a defendant fails to answer an amended complaint, even where the defendant has answered the original complaint. Parise v. Riccelli Haulers, Inc., 672 F. Supp. 72, 74 (N.D.N.Y. 1987).

Upon a defendant's default, the court accepts as true all factual allegations in the complaint. Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981); Schwartz-

---

[5]     Pajcin was also charged with perjury for lying to the SEC during testimony taken in November, 2005.

Liebman Textiles v. Last Exit Corp., 815 F. Supp. 106, 107 (S.D.N.Y. 1992) (default judgment
entered on well-pleaded allegations of a complaint that established a defendant's liability).

   Here, Pajcin has failed to respond to the Second, Third, or Fourth Amended Complaints,
or to the instant motion for summary judgment. Accordingly, the Court grants the SEC a default
judgment against Pajcin pursuant to FRCP 55(b). The Court deems true all factual allegations of
the Fourth Amended Complaint alleged against Pajcin. The default judgment thus establishes
Pajcin's liability for violations of Section 17(a) of the Securities Act and Sections 10(b) and
14(e) of the Exchange Act and Rules 10b-5 and 14e-3.

   B. Summary Judgment

      1. Legal Standard for Summary Judgment

   Pursuant to Rule 56(c) of the FRCP, a court must enter summary judgment "if the
pleadings, depositions, answers to interrogatories, and admissions on file, together with the
affidavit, if any, show that there is no genuine dispute as to any material fact and that the moving
party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In deciding a motion for
summary judgment, the Court must construe the evidence in the light most favorable to the non-
moving party and must draw all reasonable inferences in the non-moving party's favor. In re
"Agent Orange" Prod. Liab. Litig., 517 F.3d 76, 87 (2d Cir. 2008). The non-moving party
cannot, however, "escape summary judgment merely by vaguely asserting the existence of some
unspecified disputed material facts, or defeat the motion through mere speculation or
conjecture." W. World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121 (2d Cir. 1990) (internal
citations and quotations omitted).

   Pursuant to Local Rule 56.1, a party moving for summary judgment must submit a Local
Rule 56.1 Statement, setting forth the undisputed facts at issue in the case. If a party opposing

6

summary judgment fails to respond to the moving party's Rule 56.1 Statement, the facts in the Statement are deemed admitted.  In re Towers Fin. Corp. Noteholders Litig., 996 F. Supp. 266, 275 (S.D.N.Y. 1998); United States v. All Right, Title & Interest in Real Property & Appurtenances, 77 F.3d 648, 657-58 (2d Cir.).

### 2.  Application

The SEC is entitled to summary judgment on all of its claims against Pajcin, pursuant to Rule 56(c).[6]

#### a.  Section 17(a) Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5

Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 prohibit the use of manipulative or deceptive devices or contrivances in the offer or sale of securities.  Basic Inc. v. Levinson, 485 U.S. 224, 235 n.13 (1988).  In order to establish a violation of these provisions, the plaintiff must show that the defendant (1) acting with the requisite scienter, (2) made material misrepresentations or omissions or engaged in a manipulative practice, such as a scheme to defraud, (3) in connection with the purchase or sale of a security, (4) by use of an instrumentality of interstate commerce.  See 15 U.S.C. §§ 77q(a), 78j(b); 17 C.F.R. § 240.10b-5; SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir.

---

[6]      The SEC is also entitled to summary judgment pursuant to Rule 56(e) of the FRCP.  Rule 56(e) provides that a court may enter summary judgment by default if the non-movant fails to respond to the summary judgment motions. Fed. R. Civ. P. 56(e); In re Towers Fin. Corp. Noteholders Litig., 996 F. Supp. 266, 271-72 (S.D.N.Y. 1998); Champion v. Artuz, 76 F.3d 483, 485 (2d Cir. 1996).  Courts often grant summary judgment by default where the non-moving party has failed to respond to the motion in violation of court rules or scheduling orders.  See In Towers Fin. Corp. Noteholders Litig., 996 F. Supp. at 273-34 (listing cases).  Here, the Court ordered Pajcin to respond to the SEC's motion by no later than August 28, 2009.  To date, Pajcin has not submitted a response.  Accordingly, summary judgment in favor of the SEC is appropriate.

1999).  Scienter need not be shown in order to establish violations of Sections 17(a)(2) and (3) of

the Securities Act.  Aaron v. SEC, 446 U.S. 680, 696-97 (1980).

          Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."  Ernst &

Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).  Reckless conduct, "which is 'highly

unreasonable' and which represents an extreme departure from the standards of ordinary care . . .

to the extent that the danger was either known to the defendant or so obvious that the defendant

must have been aware of it," satisfies the scienter requirement.  Rolf v. Blyth, Eastman Dillon &

Co., 570 F.2d 38, 46-47 (2d Cir. 1978) (internal quotations omitted).  Information is considered

material if there is a substantial likelihood that a reasonable investor would consider such

information important in making an investment decision.  Basic, 485 U.S. at 231-232.

          Acts of insider trading constitute a manipulative or deceptive device within Section 10(b)

of the Exchange Act.  In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 665 n. 46 (S.D.N.Y.

2007).  Tippee liability for profits derived from his own insider trading is established if a

plaintiff shows that (1) the tipper possessed material non-public information concerning a

publicly traded company; (2) the tipper disclosed this information to the tippee; (3) the tippee

traded in the company's securities while in possession of the insider information;  (4) the tippee

knew or should have known that the tipper had violated a relationship of trust by providing the

non-public material information; and (5) the tippee benefited from the disclosure of the

information.  S.E.C. v. Warde, 151 F.3d 42, 47 (2d Cir. 1998).

          The requirement that the violative activity occur in the offer or sale, or in connection with

the purchase or sale, of a security is construed broadly.  SEC v. Zandford, 535 U.S. 813, 819

(2002).

Here, the uncontested facts in the SEC's Rule 56.1 Statement establish that Pajcin orchestrated the Schemes, through which he knowingly (1) obtained material, non-public, insider information about publicly traded companies; and (2) personally engaged in numerous acts of trading on the basis of this information and assisted others to do the same.[7] Pajcin earned significant profits from his own trades and from the trades executed by the other Defendants who traded on the basis of the information obtained through the Schemes. Accordingly, the Court GRANTS the SEC's motion for summary judgment on its claims pursuant to Section 17(a) of the Securities Act, and 10(b) of the Exchange Act and Rule 10b-5.

### b. Section 14(e) of the Exchange Act and Rule 14e-3

Section 14(e) of the Exchange Act and Exchange Act Rule 14e-3 prohibit insider trading in the specific context of tender offers. See U.S. v. O'Hagan, 521 U.S. 642, 667-68 (1997). Under the Rule, a tippee "violates Rule 14e-3(a) if he trades on the basis of material nonpublic information concerning a pending tender offer that he knows or had reason to know has been acquired 'directly or indirectly" from an insider of the offeror or issuer, or someone working on their behalf." Id. at 669. Section 14(e) and Rule 14e-3 impose an obligation "to disclose or abstain" from trading or tipping regardless of whether the individual (1) owes a fiduciary duty to respect the confidentiality of the information, U.S. v. Chestman, 947 F.2d 551, 669 (2d Cir. 1991); (2) has knowledge that the material, non-public information in his or her possession

---

[7]     The facts set forth in the SEC's Rule 56.1 Statement are derived principally from: (1) the unrefuted allegations in the SEC's Fourth Amended Complaint; (2) evidence submitted by the SEC in connection with its application for a temporary restraining order and other emergency relief, dated August 5, 2005 and August 18, 2005; (3) Defendant's deposition testimony, taken on November 22, 2005; (4) the Superseding Indictment, Defendant's allocution, and the criminal judgment entered in the related criminal action, United States v. David Pajcin, 05 Crim. 1284 (S.D.N.Y.); (5) the charging documents and criminal judgments in actions against co-defendants Eugene Plotkin, Nikolaus Shuster, Juan Renteria, Stanislave Shpigelman, and Jason Smith; and (6) additional exhibits submitted by the SEC with the Declaration of Melissa Coppola, dated July 21, 2009.

relates to a tender offer, See SEC v. Sargent, 229 F.3d 68, 79 (1st Cir. 2000); and/or (3) actually used the information, SEC v. Adler, 137 F.3d 1325, 1337-38 (11th Cir. 1998).

The SEC's Rule 56.1 Statement states that, as part of the Merrill Lynch Scheme, Pajcin received material, non-public information regarding a plan by Novartis AG ("Novartis") to commence a cash tender offer to purchase the outstanding public shares of Eon Labs, Inc. ("Eon Labs"). Based on this information, Pajcin purchased shares of Eon Labs. Four days after Pajcin's purchase, Novartis publicly announced the tender offer. These undisputed facts establish Pajcin's liability pursuant to Section 14(e) of the Exchange Act and Rule 14e-3. Accordingly, the Court GRANTS the SEC's motion for summary judgment on this claim.

C. Injunction and Damages

The SEC seeks: (1) a permanent injunction enjoining Pajcin from future violations of the securities laws; (2) disgorgement of Pajcin's ill-gotten gains plus prejudgment interest, in the total amount of $7,719,494.89; and (3) civil penalties in the amount of three times Pajcin's ill-gotten gains, or $20,046,334.17.

A court may award an injunction, damages, and civil penalties on a default judgment. On default, however, the court does not accept as true allegations in the complaint regarding the relief sought by the plaintiff. Au Bon Pain, 653 F.2d at 65. Rather, the plaintiff is required to prove independently that it is entitled to the relief it requests. Id. A court can make a determination regarding an injunction, damages, and penalties on the basis of the evidence before it, including the complaints and affidavits submitted by the plaintiff, as long as the court is ensured that the evidence provides a basis for the relief requested. See Transatlantic Marine Claims Agency v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997).

The Court holds that the evidence provides a basis for (1) a permanent injunction enjoining Pajcin from future violations of the securities laws; (2) disgorgement and prejudgment interest in the total amount of $7,719,494.89; and (3) civil penalties of $20,046,334.17.

1. Permanent Injunction

Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), permit the SEC to obtain permanent injunctive relief upon a showing that: (1) violations of the securities laws occurred; and (2) there is a reasonable likelihood that violations will occur in the future. SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 99-100 (2d Cir. 1978); SEC v. Manor Nursing Ctr., Inc., 458 F.2d 1082, 1100-01 (2d Cir. 1972).

The Second Circuit weighs various factors when considering whether there is a reasonable likelihood that a defendant will commit future violations of the securities laws, including: (1) the egregiousness of the violation; (2) the degree of scienter involved; and (3) the isolated or repeated nature of the violations. SEC v. Cavanagh, 155 F.3d 129, 135 (2d Cir. 1998); Commonwealth Chem. Secs., Inc., 574 F.2d at 100-01.

As discussed above with respect to summary judgment, the evidence before the Court establishes that Pajcin violated the securities laws. The Court finds that there is a reasonable likelihood that Pajcin will commit future violations. Pajcin's conduct was egregious, he acted knowingly, and he engaged in numerous acts of insider trading; in addition, he is in violation of his terms of supervised release, in having failed to report to Probation since approximately April 2008. Accordingly, the Court GRANTS a permanent injunction against Pajcin, enjoining him from future violations of Section 17(a) of the Securities Act, and Sections 10(b) and 14(e) of the Exchange Act and Rules 10b-5 and 14e-3.

11

### 2. Disgorgement and Prejudgment Interest

Disgorgement is an equitable remedy for violations of the federal securities laws, which is aimed at "forcing a defendant to give up the amount by which he was unjustly enriched." SEC v. Tome, 833 F.2d 1086, 1096 (2d Cir. 1987). To obtain disgorgement, a "[p]laintiff is not required to trace every dollar of proceedings . . . nor . . . required to identify misappropriated monies which have been commingled . . . ." SEC v. Great Lakes Equities Co., 775 F. Supp. 211, 214 n.22 (E.D. Mich. 1991), aff'd, 12 F.3d 214 (6th Cir. 1993). After a plaintiff makes a showing of the amount properly to be disgorged, the burden then shifts to the defendant who must clearly demonstrate that the amount claimed by the plaintiff is not a reasonable approximation. SEC v. First City Fin. Corp., 890 F.2d 1215, 1232 (D.C. Cir. 1989).

In insider trading cases, the tipper may be held jointly and severally liable for the profits obtained by his tippees. SEC v. Tome, 638 F. Supp. 596, 617 (S.D.N.Y. 1986); SEC v. Drucker, 528 F. Supp. 2d 450, 451 (S.D.N.Y. 2007). Courts are particularly willing to impose joint and several liability in cases in which the tipper collaborated with or had a close relationship with the tippees, and/or where the tippees agreed to share profits with the tipper. See S.E.C. v. Svoboda, 409 F. Supp. 2d 331, 346 (S.D.N.Y. 2006); S.E.C. v. Breed, No. 01 Civ. 7798, 2004 WL 909170 (S.D.N.Y. Apr. 29, 2004). Joint and several liability is appropriate because the rule against insider trading "would be virtually nullified if those in possession of such information, although prohibited from trading in their own accounts, were free to use the insider information on trades to benefit [others]." S.E.C. v. Warde, 151 F.3d 42, 49 (2d Cir. 1998).

A court can award prejudgment interest on the amount awarded as disgorgement, in order to deprive the defendant of the time-value of the money. SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 1998). In SEC injunctive actions, prejudgment interest should be calculated by applying the

Internal Revenue Service tax underpayment rate ("IRS Rate"), 26 U.S.C. § 6621(a)(2). SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1476-77 (2d Cir. 1996).

The SEC requests that Pajcin be held jointly and severally liable for all of the profits earned through the Schemes. The Court holds that joint and several liability is appropriate in this case because Defendant (1) spearheaded the Schemes; (2) conspired closely with the insider Defendants involved in the Schemes (Defendants Shpigelman, Shuster, and Smith) to obtain material, non-public information; (3) personally traded on information obtained from the insider Defendants, through the Pajcin Account and through the accounts of Anticevic and Vujovic; (4) tipped Defendants Santana, Siegel, Lopandic, Verinac, and Mihail Plotkin with the information, in exchange for a portion of the profits they gained from trading on the information; and (5) permitted Lopandic and Verinac to tip Defendants Sormaz, Borac, Dilber, and Krsic with the information, in exchange for a percentage of the profits that Sormaz, Borac, Dilber, and Krsic gained from trading on the information.

The SEC has submitted detailed affidavits establishing that Pajcin and the other Defendants who traded on the information obtained through the Schemes earned a total of $5,945,595.48 in profits from their trading.[8]  The SEC has calculated prejudgment interest of $1,773,899.41 on the disgorgement amount, using the IRS Rate for the time period from August 3, 2005 through April 1, 2009.  The SEC's affidavits provide sufficient evidence to support the awards sought.

Accordingly, the Court GRANTS the SEC's request for disgorgement and prejudgment interest in the amount of $7,719,494.89.

---

[8]      This amount excludes ill-gotten gains attributable to trading in brokerage accounts held in the names of Defendants Elvis Santana and Monika Vujovic because these parties have already disgorged their ill-gotten gains pursuant to court orders.

3.  Civil Penalties

Section 21A of the Exchange Act, 15 U.S.C. § 78u-1, provides that a court may impose a civil penalty for insider trading, in order to "go beyond disgorgement of illegal profits to add the imposition of a significant fine as a needed deterrent." Svoboda, 409 F. Supp. at 347.  Civil penalties may not exceed "three times the profit gained or loss avoided" as a result of the fraud. 15 U.S.C. § 78u-1.  Within that limit, courts have discretion to determine the precise amount of a penalty "in light of the facts and circumstances" of the case.  15 U.S.C. § 78u-1; see SEC v. Svoboda, 409 F. Supp. 2d 331, 347-48 (S.D.N.Y. 2006); SEC v. Farrell, No. 95 Civ. 6133T 1996 WL 788367, at *10 (W.D.N.Y. Nov. 6, 1996).  When determining the amount of the penalty, courts in this Circuit typically consider:  (1) the defendant's culpability; (2) the amounts of profit gained; (3) the repetitive nature of the unlawful act; and (4) the deterrent effect of a penalty, given the defendant's net worth.  SEC v. Sekhri, 98 Civ. 2320, 2002 WL 31100823, *18 (S.D.N.Y. July 22, 2002).

The SEC requests that the Court award civil penalties of three times the total profits earned through the Schemes, or $20,046,334.17.  The Court finds that the evidence supports the penalties the SEC seeks.

As is stated above, Pajcin is culpable.  Pacjin conceived of the Schemes; solicited and obtained the insider information used in the trades; personally traded on that information, and assisted others in doing so.  Pajcin's role as a main perpetrator of the fraud warrants a stiff civil penalty.  See SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 332 (S.D.N.Y. 2007) (awarding maximum civil penalty against main perpetrator of the fraud and a smaller penalty against a defendant who played a less significant role).  The total profits earned through the Schemes – over $6 million – were substantial, and Pajcin engaged repeatedly in insider trading.  In addition,

Pajcin has exhibited a flagrant disregard for the law by violating the terms of his supervised release and disappearing. These facts, taken together, indicate that substantial penalties are necessary to achieve deterrence

The Court does not have any information about Pajcin's net worth. Given the history of this action and Pajcin's repeated failure to respond, it is unlikely that the Court will be able to obtain such information. The Court declines to limit Pajcin's liability because information regarding his net worth has been rendered unavailable by his absconding. To rule otherwise would be likely to encourage unlawful flight.

Accordingly, the Court finds that, on the basis of the evidence presented by the SEC, civil penalties of in the amount of three times the total profits earned through the Schemes are warranted. The Court thus GRANTS the SEC civil penalties in the amount of $20,046,334.17.

The Court notes that penalties of more than $20 million are massive, and may have an extremely harsh effect on Pajcin. It is possible that, if the Court had more information on Pajcin's net worth, the Court could find that lower penalties would be sufficient to deter Pajcin from committing future violations. Accordingly, the Court will allow Pajcin the opportunity to move for a reduction of penalties. If Pajcin wishes to file such a motion, he must inform the Court of this fact, in writing, by no later than June 11, 2010.

IV.    Conclusion

For the reasons stated above, the Court GRANTS the SEC's motion for a default judgment, pursuant to Rule 55(b), and for summary judgment, pursuant to Rule 56(c).

The Court awards the SEC: (1) a permanent injunction enjoining Pajcin from future

violations of the securities laws; (2) disgorgement and prejudgment interest in the amount of

$7,719,494.89; and (3) civil penalties in the amount of $20,046,334.17.

       SO ORDERED.

DATED:     New York, New York
              May 14, 2010

                                            KIMBA M. WOOD
                                 United States District Judge