**George Canellos**
**Regional Director**
**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
3 World Financial Center, Room 4300
New York, New York 10281
(212) 336-1020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

─────────────────────────────────────────

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | 05 Civ. 6991 (KMW) |
| Plaintiff, : | |
| : | |
| -against- : | |
| : | |
| SONJA ANTICEVIC, DAVID PAJCIN, EUGENE : | |
| PLOTKIN, STANISLAV SHPIGELMAN, : | |
| NICKOLAUS SHUSTER, JUAN C. RENTERIA, JR., : | |
| HENRY SIEGEL, ELVIS SANTANA, MONIKA : | |
| VUJOVIC, MIKHAIL PLOTKIN, PERICA : | |
| LOPANDIC, BRUNO VERINAC, ZORAN SORMAZ, : | |
| ILIJA BORAC, ANTUN DILBER, ANTO KRSIC, : | |
| and JASON C. SMITH, : | |
| : | |
| Defendants. : | |

─────────────────────────────────────────

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR DEFAULT JUDGMENTS AGAINST BRUNO VERINAC AND ANTUN DILBER PURSUANT TO RULE 55(b) OF THE FEDERAL RULES OF CIVIL PROCEDURE**

**TABLE OF CONTENTS**

BACKGROUND…………………………………………………………………………….1

SERVICE OF THE DEFAULTING DEFENDANTS……................................................2

FACTS……………………………………………………………………………………….2

ARGUMENT

I.    THE COURT SHOULD ENTER DEFAULT JUDGMENTS AGAINST THE DEFAULTING DEFENDANTS PURSUANT TO FRCP 55(b)……………........6

II.    THE COURT SHOULD GRANT THE COMMISSION'S REQUESTS FOR INJUNCTIVE AND MONETARY RELIEF…………………………………..7

    A.    THE COURT SHOULD PERMANENTLY ENJOIN THE DEFAULTING DEFENDANTS FROM FUTURE VIOLATIONS OF THE SECURITIES LAWS………………………………………………….7

    B.    THE COURT SHOULD ORDER THE DEFAULTING DEFENDANTS TO PAY DISGORGEMENT……………………………………………11

    C.    THE COURT SHOULD ORDER THE DEFAULTING DEFENDANTS TO PAY PREJUDGMENT INTEREST……………………………........12

    D.    THE COURT SHOULD ORDER THE DEFAULTING DEFENDANTS TO PAY CIVIL PENALTIES…………………………………………..13

CONCLUSION……………………………………………………………………………15

Plaintiff Securities and Exchange Commission (the "Commission") submits this Memorandum in support of its motion for default judgments against defendants Bruno Verinac and Antun Dilber (collectively, the "Defaulting Defendants"). The Defaulting Defendants are foreign nationals who have been properly served with process under the appropriate governing provisions in this proceeding, which has been highly publicized both domestically and abroad. The Commission brings this motion pursuant to Rule 55(b) of the Federal Rules of Civil Procedure ("FRCP"), based upon each of the Defaulting Defendants' failure to answer the operative Fourth Amended Complaint ("Complaint"), which the Commission filed nearly four years ago. The Commission also seeks the entry of an order directing each of the Defaulting Defendants to pay disgorgement, prejudgment interest and penalties.

## BACKGROUND

This case was originally brought in 2005 as an emergency action, seeking expedited relief stemming from insider trading in the securities of, among other entities, Reebok International Ltd. The Complaint charges seventeen defendants for their collective participation in three separate insider trading schemes orchestrated by defendants Eugene Plotkin and David Pajcin, based upon trading in material non-public information stemming from Merrill Lynch & Co., Inc. (the "Merrill Lynch Scheme"), Business Week magazine (the "Business Week Scheme") and grand jury proceedings in New Jersey concerning Bristol-Myers Squibb Co. (collectively, the "Schemes"). The Complaint charges both of the Defaulting Defendants with participation in the Merrill Lynch and Business Week Schemes, and charges Verinac with coordinating directly with Plotkin and/or Pajcin in furtherance of these two Schemes.

## SERVICE OF THE DEFAULTING DEFENDANTS

Verinac is a Croatian national who was duly served by publication, as of April 23, 2009, pursuant to the terms of an Order entered by the Court on February 13, 2009 (docket entry number "D.E." 140), as modified by letter endorsements entered on March 12 and 25, 2009 (D.E. 144, 146), respectively.  *See* D.E. 184 (Certificate of Service).

Dilber is a Croatian national, who was duly served with the Summons and Complaint on September 1, 2006, pursuant to the terms of an Order dated August 30, 2006 (D.E. 90).  *See* D.E. 92 (Certificate of Service).

The Clerk of Court entered Certificates of Default against each of the Defaulting Defendants on February 16, 2010.  *See* Declaration of Scott L. Black ("Black Dec."), ¶¶ 4-5, Exhibits ("Exhs.") A, B.

## FACTS

The Complaint alleges the following facts against the Defaulting Defendants, which are to be deemed true for purposes of this motion, Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981).

1.   **Verinac**

Pajcin was introduced to Verinac by a mutual acquaintance in 2004.  (Complaint ("Cmplt."), ¶ 54.)  In 2005, Verinac and co-defendant Perica Lopandic met with Pajcin in Austria and outlined to him the terms of a scheme whereby Pajcin could arrange for the theft of copies of business publications in order to enable the three of them and others to trade on confidential non-public information contained therein.  (*Id.*)  Verinac and Lopandic indicated that they had previously been involved in at least one such scheme.  (*Id.*)

Following Pajcin's initial discussion with Verinac, Pajcin and Plotkin began to put the Business Week Scheme into motion. (Cmplt., ¶ 55.) Pursuant to the Business Week Scheme, Pajcin and Plotkin paid two individuals during the period October 11, 2004 through approximately September 29, 2005, to obtain employment at one of Business Week magazine's printing plants, Quad/Graphics, Inc., steal copies of the magazine prior to their public release, and call Pajcin and Plotkin with information concerning the contents of the "Inside Wall Street" column. (Cmplt., ¶¶ 3, 56-66.) In general, the Defendants purchased securities in the companies mentioned in the "Inside Wall Street" column before the close of the market on the Thursday on which the column became available after the market close, and then sold the securities the following day, so as to lock in a profit resulting from the change in the stock price generated by the mention of the company in the "Inside Wall Street" column. (Cmplt., ¶ 65.) Verinac and Lopandic had arrangements with Pajcin and Plotkin whereby Verinac and Lopandic would pay Pajcin and Plotkin a portion of profits generated by themselves, as well as by profits generated by Dilber and co-foreign defendants Zoran Sormaz, Ilija Borac, and Antun Krisc, based upon information Pajcin and Plotkin provided Verinac and Lopandic concerning Business Week. (Cmplt., ¶ 60.) After receiving information from Pajcin and Plotkin stemming from Business Week, Verinac and Lopandic traded for their own accounts, and tipped Sormaz, Borac, Dilber and Krsic with certain of the information as well. (Cmplt., ¶ 61.)

In connection with the Business Week Scheme Pajcin and Plotkin tipped Verinac and Lopandic with information relating to the contents of the "Inside Wall Street" column concerning the securities of at least TheStreet.com and Biolase Technology, Inc. ("Biolase") (in the November 18, 2004 publication), Curis Inc. ("Curis") (in the December 2, 2004 publication), Cornell Companies, Inc. ("Cornell") (in the January 6, 2005 publication), Spectrum

3

Pharmaceuticals, Inc. ("Spectrum") (in the January 13 and June 14, 2005 publications), Sipex Corp. ("Sipex") (in the December 9, 2004 publication), Arbitron Inc. ("Arbitron") (in the January 20, 2005 publication), Impax Laboaratories, Inc. ("Impax") (in the March 3, 2005 publication), Casual Male Retail Group, Inc. ("Casual Male") and FedEx Corporation ("FedEx") (in the June 16, 2005 publication), Energy Conversion Devices, Inc. ("Energy Conversion") (in the June 23, 2005 publication), Progressive Gaming International Corp. (formerly known as Mikohn Gaming Corp.) ("Mikhon Gaming") (in the June 30, 2005 publication) and Perficient, Inc. ("Perficient") and PriceSmart, Inc. ("PriceSmart") (in the June 9, 2005 publication). (Cmplt., ¶¶ 57, 59, 61.)  Verinac and Lopandic, in turn then tipped Sormaz, Borac, Dilber and/or Krsic with the information they received from Plotkin and Pajcin relating to the contents of the "Inside Wall Street" column concerning the securities of at least Arbitron, Biolase, Curis, Spectrum, Cornell, Impax, Sipex, TheStreet.com, Casual Male, Energy, Mikohn Gaming, and Spectrum, and tipped Borac with the information relating to the contents of the "Inside Wall Street" column concerning the securities of at least FedEx, Mikohn Gaming, Perficient, and PriceSmart.  (Cmplt., ¶ 61.)

As a result of Verinac and Lopandic's participation in the <u>Business Week</u> Scheme, Dilber, Krsic, Sormaz and Borac obtained ill-gotten gains, as set forth in greater detail in the accompanying Declaration of Melissa Coppola.  (Cmplt., ¶ 62; Declaration of Melissa Coppola ("Coppola Dec.")), ¶¶ 5-9; Exhs. A-D.)

Verinac and Lopandic also had a similar arrangement with Pajcin and Plotkin in connection with the Merrill Lynch Scheme, whereby Verinac and Lopandic agreed to pay Pajcin and Plotkin a percentage of the profits made by themselves as well as by Borac, Sormaz, Dilber, and/or Krsic based on information obtained from that Scheme.  (Cmplt., ¶ 38.)  Pursuant to the

4

Merrill Lynch Scheme, Pajcin and Plotkin paid Stanislav (aka "Stan") Shpigelman, who was employed as a Mergers and Acquisitions Analyst at Merrill Lynch & Co, Inc. ("Merrill Lynch"), to provide them with information about pending mergers and acquisitions deals on which Merrill Lynch was working, prior to the time such information became public. (Cmplt., ¶ 2.) As a result, from late 2004 to the summer of 2005 Shpigelman provided Pajcin and Plotkin with non-public information concerning at least six mergers or acquisitions that Merrill Lynch was working on prior to the time the deals became public, including mergers or acquisitions involving Reebok International Ltd. ("Reebok"), Eon Labs, Inc. ("Eon Labs"), Cinergy Corp. ("Cinergy"), Celgene Corp. ("Celgene"), The Gillette Company ("Gillette"), and LabOne, Inc. ("LabOne"). (*Id.*)

After receiving this information from Shpigelman, Pajcin and Plotkin tipped Verinac and Lopandic about certain of the Merrill Lynch transactions, including at least the information provided by Shpigelman relating to the Gillette, Eon Labs, Cinergy, Reebok, LabOne, and Celgene Transactions. (Cmplt., ¶ 44.) Verinac and Lopandic, in turn, tipped Borac about certain of the Merrill Lynch transactions, including the information relating to the Cinergy, LabOne, Reebok, and Celgene Transactions, tipped Sormaz about certain of the Merrill Lynch transactions, including the information relating to the Reebok and Celgene Transactions, and, tipped Sormaz, Borac, Dilber and/or Krsic about certain of the Merrill Lynch transactions, including the information relating to the Cinergy, Eons Labs, Reebok, and Celgene transactions. (*Id.*)

As a result of Verinac's participation in the Merrill Lynch Scheme, each of the Defaulting Defendants obtained ill-gotten gains as set forth in greater detail in the accompanying Declaration of Melissa Coppola. (Cmplt., ¶ 45; Coppola Dec., ¶¶ 5-9; Exhs. A-D.))

5

During the period of time referenced in the Complaint (the "Relevant Period") Verinac was a co-signatory on at least one brokerage account at Direktanlage.at AG ("Direktanlage"), account number xxxxx8634, held in the name of Dilber, through which certain of the securities referred to above were traded. (Cmplt., ¶ 20.)

**2.      Dilber**

Dilber received and traded on information from Verinac and Lopandic in connection with the Merrill Lynch and Business Week Schemes. (Cmplt., ¶¶ 23, 44, 45, 46, 61-63.) During the Relevant Period, Dilber held at least one brokerage account at Direktanlage, account number xxxxx8634 (any and all such accounts, the "Dilber Direktanlage Account") through which certain of the securities referred to above were traded. (Cmplt., ¶ 23.)

## ARGUMENT

**I.      THE COURT SHOULD ENTER DEFAULT JUDGMENTS AGAINST THE DEFAULTING DEFENDANTS PURSUANT TO FRCP 55(b)**

The entry of a default judgment under FRCP 55(b) is left to the "sound judicial discretion" of the court. *See* 10 Wright, Miller & Kane, Federal Practice & Procedure § 2685 (3d ed. 2005). Where "a party fails to respond . . . the court is ordinarily justified in entering a judgment against the defaulting party." Bermudez v. Reid, 733 F.2d 18, 21 (2d Cir. 1984). Each of the Defaulting Defendants was properly served with process and has failed to file an answer. (Black Decl., ¶ 2.)[1] Neither of the Defaulting Defendants is an infant, incompetent, or in the

---

[1]     The Commission received a letter from Dilber, postmarked September 15, 2006, in which Dilber suggests that he was deceived by his nephew, Verinac, into permitting Verinac to open the Dilber Direktanlage Account, and exercise trading authority through it. *See* Exhibit 5 to the Declaration of Scott L. Black in Support of Motion for Service by Publication, dated December 22, 2008 (D.E. 138). Dilber goes on to claim that he had no involvement or knowledge of the trades at issue, and the letter purports to attach a notarized statement from Verinac, confirming Dilber's portrayal of events. Dilber has not, however, filed an Answer with the Court as required by FRCP 7 or otherwise moved to challenge the complaint on grounds of service, venue, or pleading sufficiency, and has

6

military, and, therefore, neither of them is protected from entry of a default judgment. (Black Dec., ¶ 3; FRCP 55.) Accordingly, a judgment by default is appropriate.

Moreover, upon a defendant's default, the Court should accept as true all of the factual allegations of the complaint. Au Bon Pain Corp. v. Artect, Inc., 653 F.2d 61, 65 (2d Cir. 1981); Schwartz-Liebman Textiles v. Last Exit Corp., 815 F. Supp. 106, 107 (S.D.N.Y. 1992) (default judgment entered on well-pleaded allegations of a complaint that established a defendant's liability). In failing to answer the Complaint, the Defaulting Defendants have admitted all of the Complaint's factual allegations as to liability. The Commission must still, however, prove the amount of disgorgement and any other damages independently. Au Bon Pain, 653 F.2d at 65. A discussion of the Commission's sought monetary relief is set forth below in Section II below.

## II. THE COURT SHOULD GRANT THE COMMISSION'S REQUESTS FOR INJUNCTIVE AND MONETARY RELIEF

### A. THE COURT SHOULD PERMANENTLY ENJOIN THE DEFAULTING DEFENDANTS FROM FUTURE VIOLATIONS OF THE SECURITIES LAWS

The Court should permanently enjoin the Defaulting Defendants from future violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Permanent injunctions against future violations of the securities laws may be ordered as part of a judgment by default, if a factual basis for that relief exists. SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 814 (2d Cir.

---

therefore defaulted in the action. *See* FRCP 55(a); C.A. Wright & A. R. Miller, 10A Fed. Prac. & Proc. § 2682. Moreover, Dilber's letter did not indicate an intent to defend the action and therefore does not constitute an "appearance" within FRCP 55(b)(2) that would entitle him to notice of the present motion for default judgment. *See* C. A. Wright & A. R. Miller, 10A Fed. Prac. & Proc. § 2687 ("The notice requirement is … intended to protect those parties who, although delaying in a formal sense by failing to file pleadings … have otherwise indicated … a clear purpose to defend the suit."). Nevertheless, the Commission is providing Dilber with notice of the present motion by mailing a copy of the motion papers via international courier to the address he lists in his letter.

1975). Section 21(d) of the Exchange Act, 15 U.S.C. §78u(d), entitles the Commission to obtain permanent injunctive relief upon a showing that: (1) violations of the securities laws occurred; and (2) there is a reasonable likelihood that violations will occur in the future.[2] SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90 (2d Cir. 1978); SEC v. Manor Nursing Ctr., Inc., 458 F.2d 1082, 1100-01 (2d Cir. 1972); SEC v. Softpoint, Inc., 958 F. Supp. 846, 866 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1348 (2d Cir. 1998).

*Violations of the Antifraud Provisions*

The antifraud provisions of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5, prohibit the use of manipulative or deceptive devices or contrivances in connection with the purchase or sale of securities. Basic, Inc. v. Levinson, 485 US 224, 235 n.13 (1988) (*citing* SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir. 1968) (*en banc*)). In order to establish a violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the Commission must show that the Defaulting Defendants, (1) acting with the requisite scienter, (2) made material misrepresentations or omissions or engaged in a manipulative practice, such as a scheme to defraud, (3) in connection with the purchase or sale of a security, (4) by use of an instrumentality of interstate commerce, such as the mails or wires. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5; SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999) (*citing* SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1477 (2d Cir. 1996)).

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." Ernst & Ernst v. Hochfelder, 425 US 185, 193 n.12 (1976); Basic, 485 US at 231. Reckless conduct, "which

---

[2] Unlike private litigants, the Commission need not show risk of irreparable injury, or the unavailability of remedies at law in a request for injunctive relief. SEC v. Unifund SAL, 910 F.2d 1028, 1036 (2d Cir. 1990); Mgmt. Dynamics, 515 F.2d at 808-09 (stating that standards of public interest, not requirements of private litigation, govern Commission requests for injunctive relief).

8

is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it,'" satisfies the scienter requirement. Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 46-47 (2d Cir. 1978) (*quoting* Sanders v. John Nuveen & Co., 554 F.2d 790, 793 (7th Cir. 1977)).  Information is considered material if there is a substantial likelihood that a reasonable investor would consider such information important in making an investment decision. Basic, 485 US at 231-232; TSC Indus., Inc. v. Northway, Inc., 426 US 438, 449 (1976).  Acts of insider trading constitute a manipulative or deceptive device within Section 10(b) of the Exchange Act.  In re Refco, Inc. Secs. Litig., 503 F. Supp.2d 611, 665 n. 46 (S.D.N.Y. 2007).  The requirement that the violative activity occur in connection with the purchase or sale of a security is construed broadly.  SEC v. Zandford, 535 U.S. 813 (2002).

      Here, each of the elements necessary to establish a violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder is established as a matter of law because, on a default judgment motion, the well-pleaded allegations of the complaint are deemed admitted as to liability.  Trans World Airlines, Inc. v. Hughes, 449 F.2d 51 (2d Cir. 1971), *rev'd on other grounds*, 409 US 363 (1973); Comdyne I, Inc. v. Corbin, 908 F.2d 1142, 1149 (3d Cir. 1990). Accordingly, the Commission has established that the Defaulting Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

*Likelihood of Future Violations*:

In considering whether there is a reasonable likelihood that a defendant will commit future violations of the securities laws, the Second Circuit weighs various factors including: (1) the egregiousness of the violation; (2) the degree of scienter involved; and (3) the isolated or repeated nature of the violations. SEC v. Cavanagh, 155 F.3d 129, 135 (2d. Cir. 1998); Softpoint, Inc., 958 F. Supp. at 867; Commonwealth Chem. Secs., Inc., 574 F.2d at 100-01.  As a general matter, the Second Circuit has noted that "the commission of past illegal conduct is highly suggestive of the likelihood of future violations. . . . [F]actors suggesting that the infraction might not have been an isolated occurrence are always relevant. . . . Moreover, appellate courts have repeatedly cautioned that cessation of illegal activity does not ipso facto justify the denial of an injunction." Management Dynamics, Inc., 515 F.2d at 808.  Each of the factors set forth above weighs towards injunctive relief against the Defaulting Defendants.

First, the Defaulting Defendants' conduct was egregious.  As discussed below, through his participation in the Merrill Lynch and Business Week Schemes, Dilber reaped nearly $26,000 in ill-gotten gains.  And through his participation in the Merrill Lynch and Business Week Schemes, Verinac enabled Dilber, Krsic, Sormaz and Borac to collectively reap over $1.4 million in ill-gotten gains.  Verinac's conduct was especially egregious in that he provided specific guidance to Pajcin and Plotkin on the execution of the Business Week Scheme, and entered into arrangements with Pajcin and Plotkin whereby they agreed to compensate him for the illegal information.

Second, the Defaulting Defendants acted with scienter.  Verinac's direct interactions with Pajcin and Plotkin indicate that he acted with intent to commit fraud.  At a minimum, Dilber acted with extreme recklessness.  Even if he was unaware of the specific origin of the

10

information, the circumstances under which he received the information, and his agreement to set aside a portion of his proceeds, should have mandated further inquiry on his part.

Finally, the Defaulting Defendants engaged in the fraudulent conduct repeatedly through the execution of dozens of trades. Moreover, their refusal to answer the allegations of the Complaint suggest that they would be willing to engage in future violations of the securities laws. Accordingly, they should each be permanently enjoined from future violations of Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder.

### B. THE COURT SHOULD ORDER THE DEFAULTING DEFENDANTS TO PAY DISGORGEMENT

Disgorgement is an equitable remedy for violations of the federal securities laws aimed at "forcing a defendant to give up the amount by which he was unjustly enriched." SEC v. Tome, 833 F.2d 1086, 1096 (2d Cir. 1987) (*quoting* Commonwealth Chem. Secs., 574 F.2d at 102). In insider trading cases, a tipper is jointly and severally liable for the profits obtained by his tippees. SEC v. Tome, 638 F. Supp. 596, 617 (S.D.N.Y. 1986).

In meeting its burden for disgorgement, "[p]laintiff is not required to trace every dollar of proceeds … nor is plaintiff required to identify misappropriated monies which have been commingled …." SEC v. Great Lakes Equities Co., 775 F. Supp. 211, 214 n.21 (E.D. Mich. 1991), *aff'd*, 12 F.3d 214 (6th Cir. 1993). After the government makes a showing of the disgorgement figure, the burden then shifts to the defendant who must clearly demonstrate that the disgorgement figure is not a reasonable approximation. SEC v. First City Financial Corp., 890 F.2d 1215, 1232 (D.C. Cir. 1989). "[T]he risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." Id. (*citing*, *inter alia,* Elkind v. Liggett & Myers, Inc., 635 F.2d 156, 171 (2d Cir. 1980)). This principle is applicable in the context of SEC enforcement suits, where deterrence is the key objective. Id. at 1232 n.24.

11

Here Dilber reaped $25,977.60 in ill-gotten gains based on his trading in the Merrill Lynch and Business Week Schemes. (Coppola Dec., ¶ 8, Exh. D.) As a result of the information Verinac provided Dilber, Krsic, Sormaz and Borac,[3] those foreign defendants reaped $1,414,595.79 in ill-gotten gains. (Coppola Dec., ¶¶ 5-9; Exhs. A-D.) Verinac, as a tipper, is jointly and severally liable for those proceeds. Tome, *supra*. Accordingly, an order holding Dilber and Verinac liable for disgorgement in these sums is appropriate.

### C. THE COURT SHOULD ORDER THE DEFAULTING DEFENDANTS TO PAY PREJUDGMENT INTEREST

Awarding prejudgment interest deprives defendants of the time value of their ill-gotten gains and is a proper exercise of judicial discretion in Commission cases. SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 1998); SEC v. Musella, 748 F. Supp. 1028, 1042-43 (S.D.N.Y. 1989), *aff'd*, 898 F.2d 138 (2d Cir. 1990). Ordering payment of prejudgment interest is "intended to deprive wrongdoers of profits they illegally obtained by violating the securities laws. In other words, requiring the payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest-free loan procured as a result of illegal activity." SEC v. Falbo, 14 F. Supp.2d 508, 528 (S.D.N.Y. 1998). The Commission has calculated prejudgment interest of $9,003.45 on Dilber's $25,977.60 of ill-gotten gains for the time period from August 3, 2005 through July 1, 2010, for a total amount of $34,981.05 of disgorgement and prejudgment interest. (Coppola Dec., ¶ 10; Exh. E.) The Commission has calcuated prejudgment interest of $490,277.69 on Dilber, Krsic, Sormaz and Borac's collective $1,414,595.79 ill-gotten gains (for

---

[3] Since the Commission alleged that Lopandic received material non-public information from Pajcin and Plotkin directly, the Commission is not seeking to hold Verinac liable as a tipper to Lopandic, and, accordingly, is not seeking to hold Verinac jointly and severally liable for Lopandic's ill-gotten gains.

which Verinac is jointly and severally liable) for the same period for a total of $1,904,873.48 of disgorgement and prejudgment interest.  (Coppola Dec., ¶ 11; Exh. F.)

Prejudgment interest should be calculated by applying the Internal Revenue Service tax underpayment rate ("IRS rate"), 26 U.S.C. § 6621(a)(2), which the Commission has adopted in connection with administrative proceedings.  *See* Rule 600(b) of the Commission's Rules of Practice, 17 C.F.R. § 201.600(b).  The Second Circuit has upheld the application of the IRS rate in Commission injunctive actions.  First Jersey Secs., Inc., 101 F.3d at 1476-77; *see also* SEC v. Moran, 944 F. Supp. 286, 295 (S.D.N.Y. 1996).  The IRS rate "reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from the fraud."  First Jersey, 101 F.3d at 1476.

### D. THE COURT SHOULD ORDER THE DEFAULTING DEFENDANTS TO PAY CIVIL PENALTIES

The Exchange Act provides for three separate "tiers" of potential penalties, which increase depending upon the seriousness of the violation.  For violations occurring after February 14, 2005 the following amounts apply:

| Tier | Penalty for Individual |
| --- | --- |
| First Tier (any violation) | Up to $6,500 or gross amount of pecuniary gain |
| Second Tier (violation involving fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement) | Up to $60,000 or gross amount of pecuniary gain |

| Tier | Penalty for Individual |
|---|---|
| Third Tier (violation involving fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement and such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons) | $120,000 or gross amount of pecuniary gain |

Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3); 17 C.F.R. § 201.1002, Table III to Subpart E.

The Court has great discretion in assessing civil penalties based upon the facts and circumstances of the case. *SEC v. Moran*, 944 F. Supp. 286, 296 (S.D.N.Y. 1996). In determining whether civil penalties are to be imposed, and the amount of such civil penalties, courts consider number of factors, including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition. *SEC v. Opulentica, LLC*, 479 F. Supp.2d at 331; *SEC v. Coates*, 137 F. Supp.2d 413, 428-29 (S.D.N.Y. 2001).

The purpose of civil money penalties is to punish the individual violator and to deter further violations of the federal securities laws. The Commission does not request a specific amount of a civil money penalty. The Court, in its discretion, should set the appropriate amount.

## **CONCLUSION**

For the foregoing reasons, the Court should enter default judgments against Verinac and Dilber, permanently enjoin them from future violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and order them to each pay disgorgement, prejudgment interest and civil penalties.

Dated: New York, New York
      July 1, 2010

s/_____
Scott L. Black
Securities and Exchange Commission
3 World Financial Center
New York, New York 10281
(212) 336-0029
blacks@sec.gov